AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
v.
JUAN GIRALDO and
✓CLARA VASQUEZ,

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 06-2019-GARBER

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about April 5, 2004 in Miami-Dade county, in the Southern District of Florida defendant(s) did, (Track Statutory Language of Offense)

knowingly conceal more than $10,000 in currency and attempted to transfer such currency from within the United States to a place outside the United States, with intent to evade a currency reporting requirement, and attempted to transport funds from within the United States to a place outside the United States, with intent to promote the carrying on of specified unlawful activity, that is, distribution of cocaine,

in violation of Title 31 and 18 United States Code, Section(s) 5332 and 1956.

I further state that I am a(n) DEA Special Agent (Official Title) and that this complaint is based on the following facts:

See attached Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

James McCormack
Signature of Complainant

Sworn to before me and subscribed in my presence,

1-5-06 at Miami FL
Date City and State

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer

Barry L. Garber
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

# AFFIDAVIT IN SUPPORT OF ARREST WARRANT

James McCormack, Special Agent of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, states:

1. I am a Special Agent with the DEA and have been so employed since 1997. I have received specialized training in investigation of drug dealing and money laundering, including the tracing of contacts amongst drug dealers and their suppliers, and the tracking of funds obtained from sales of controlled substances.

2. This affidavit is submitted in support of arrest warrants for JUAN GIRALDO and CLARA VASQUEZ. As such it states the facts needed to establish probable cause, but does not describe all information I have learned in the course of the investigation. The information in this affidavit is based on investigations conducted by myself and other Special Agents of the DEA, information provided by other law enforcement officers, and a reliable confidential source (CS) whose information resulted in the seizures of money and cocaine and the arrests and convictions described herein.

3. On March 14, 2004, I and other DEA agents and Providence police officers established surveillance around the vicinity of 25 Lubec Street, Providence, Rhode Island. This was the residence of defendant CLARA VASQUEZ, the sister of defendant JUAN GIRALDO. We were there to surveill a meeting between a confidential source (CS) and GIRALDO and VASQUEZ for the purpose of having the CS buy a kilogram of cocaine from GIRALDO. We observed all three persons entering and then leaving the apartment, after which the CS turned over to me a kilogram of cocaine he had just been provided by GIRALDO. The CS advised that VASQUEZ was present when he was given the cocaine and had discussed the drug deal with him.

4. The CS then engaged in phone conversations with both GIRALDO and VASQUEZ about payment for the cocaine. He was given $24,500 in government funds to pay for the cocaine, and returned to the apartment, where he turned the money over to VASQUEZ. No arrests were made at that time

because our investigation was continuing.

5. On April 4, 2004, the CS reported to me about a conversation he had heard between GIRALDO and VASQUEZ. They had discussed travel plans for VASQUEZ and "Henry" (LNU) to take money to Colombia. The money would be in the form of U.S. currency concealed in money belts. One belt would hold $100,000; the other, $67,000. The source had also seen their travel itinerary, including airlines and flight numbers for travel from Providence through Miami to Colombia. I was able to verify all of the travel information. However, the CS had no information on whom the money would be delivered to, or who it was coming from other than GIRALDO.

6. On the morning of April 5, 2004, the CS reported that GIRALDO had put the money belt on VASQUEZ and that it contained cash which GIRALDO had picked up from "Cristina," at an unknown address. I and other agents established surveillance at the airport in Providence and observed VASQUEZ and another man, whose description matched "Henry," arrive at and enter the airport together. However, immediately upon entering the airport, they split up and thereafter acted like they did not know each other. This type of behavior is indicative of experience in transporting currency illegally. Experienced currency smugglers know that if one smuggler falls under suspicion from law enforcement and is stopped and questioned, his or her traveling companions are also likely to be questioned. Hence even if they are smuggling together they will act as if they are strangers.

7. Later that day, "Henry" (subsequently identified as Henry Allen Muriel) and VASQUEZ attempted to change planes in Miami, in the Southern District of Florida, in order to complete their travel to Colombia. They were stopped by DEA agents in Miami and were questioned about their travel. They gave consent for searches of their persons that revealed $105,880 in a money belt worn by VASQUEZ and $70,108 in a money belt worn by Muriel. Both admitted that they knew they were required to report their transport of the currency, but that they had no plans to report the money as required by law. Muriel

could not provide any explanation of where the money he was carrying came from. VASQUEZ claimed that her money came from her jewelry business. However, she had no business cards and said she had no business phone number. Moreover, a drug detection dog alerted to the currency she was carrying. VASQUEZ said she was traveling by herself and was not accompanied by anyone else, contrary to the observations of surveilling agents.

8. The currency was wrapped in plastic, which was subsequently submitted to the Warwick, Rhode Island Police Department for fingerprint analysis. A latent fingerprint was developed on the plastic wrapping of the currency carried by VASQUEZ which was positively identified as belonging to JUAN GIRALDO. The money was seized, but VASQUEZ and Muriel were not arrested.

9. In a subsequent conversation which was recorded by the CS, VASQUEZ discussed how she was stopped by officers in Miami and the money seized, and remarked that she hoped that Henry did not "snitch" to law enforcement. Also in a subsequent conversation recorded by the CS, GIRALDO talked about this seizure of cash and said that he had previously sent someone else through Miami, and the money got there without problems. GIRALDO has discussed with the CS other problems his drug trafficking business has had with law enforcement. On one occasion in 2004 he mentioned that one of his men had gotten caught with 15 kilos.

10. About two months after the seizure at Miami International Airport, on June 7, 2004, the CS described a conversation he recently had with GIRALDO which touched on the possibility of another sale of cocaine to the CS. GIRALDO also told the CS that he was going to Colombia later that day, with his cousin Carlos. The CS stated that GIRALDO's conversation indicated that he and his cousin would be carrying U.S. currency to Colombia.

11. Later on June 7, Carlos and JUAN GIRALDO and two other companions prepared to board planes at Logan Airport in Boston, Massachusetts for travel to Bogota, Colombia. They were

approached by DEA agents and gave consents to search their persons. All had U.S. Currency concealed on their persons. JUAN GIRALDO was found to be carrying $18,531; Carlos Giraldo $10,000; a third person $9,000, and a fourth $4,000. The fourth person admitted that the money he was carrying belonged to JUAN GIRALDO. None of the four had declared the currency. All of them eventually consented to the money's forfeiture to the government.

12. JUAN GIRALDO was arrested at the airport in Boston on June 7, 2004. He was charged with the sale of the kilogram of cocaine he had previously sold to the CS. CLARA VASQUEZ was also arrested and charged with assisting in GIRALDO'S sale of cocaine to the CS. These charges were brought in United States District Court of Rhode Island. Neither defendant was charged with any offenses relating to the transport of currency.

13. On February 18, 2005, CLARA VASQUEZ was sentenced to 18 months incarceration as a result of a guilty plea to assisting in GIRALDO's sale of cocaine to the CS on March 14, 2004. On July 29, 2005, JUAN GIRALDO was sentenced to 71 months incarceration for his sale of cocaine to the CS.

14. Based on the foregoing, there is probable cause to believe that JUAN GIRALDO and CLARA VASQUEZ committed violations of Title 31, United States Code, Section 5332, prohibiting bulk cash smuggling, and Title 18, United States Code, Section 1956, prohibiting money laundering.

By: James McCormack [signature]
James McCormack
Special Agent, DEA

Sworn to and subscribed
before me this 5th day of
January, 2006
[signature]
BARRY L. GARBER
U.S. Magistrate Judge